Filed 2/18/15; part. pub. order 3/16/15 (see end of opn.); reposted to correct pub. description

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

KEN R. BAKER,

    Plaintiff and Respondent,

        v.

ALFONSE CASTALDI et al.,

    Defendants and Appellants.

F067687

(Mariposa Super. Ct. No. 10161)

**OPINION**

APPEAL from a judgment of the Superior Court of Mariposa County. F. Dana Walton, Judge.

Cyril L. Lawrence for Defendants and Appellants.

Silveira, Mattos & Lewis and Weldon J. Mattos, Jr., for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Respondent and plaintiff Ken R. Baker sued Theresa Castaldi[1] and appellant Alfonse Castaldi for allegedly stealing antiques he owned. Plaintiff[2] sought punitive

---

[1] Theresa Castaldi was a defendant in the trial court proceedings, but is not an appellant in this appeal.

[2] We refer to Ken R. Baker as "plaintiff" to distinguish him from appellant Annette Baker, trustee of the Ann Jay Trust.

damages. Trial proceeded to a first phase[3] on March 25, 2013 and a punitive damages calculation phase on August 6, 2013. The first phase dealt with liability, compensatory damages and whether plaintiff was entitled to punitive damages. The second phase dealt with the calculation of the punitive damages.

After the first phase completed, the court found both Theresa and Alfonse jointly and severally liable for conversion. On May 20, 2013, months before the punitive damages phase began, a document entitled "judgment" was filed. The "judgment" indicated that judgment was against both defendants, jointly and severally, and set forth $610,500 in compensatory damages plus interest and costs. The "judgment" went on to state that the court "finds by a preponderance of the evidence[4] that both defendants Alfonse Castaldi and Theresa Castaldi have acted with malice and with oppression toward plaintiff Ken Baker warranting an award of punitive damages to be assessed at a separate trial.…"

Several notices of appeal were filed in superior court, each identifying only the May 20, 2013, "judgment" as the subject of the appeal.

We conclude that the May 20, 2013, "judgment" was not a final, appealable judgment. Since "[i]t is the duty of an Appellate Court on its own motion to dismiss an

---

**3** The trial court's purported judgment issued on May 20, 2013 refers to the punitive damages phase as a "separate trial." The common nomenclature is to refer to the punitive damages proceedings as the second "phase" of the trial, rather than an entirely separate trial. (E.g., *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 913; *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 919; *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554, 558; *Rivera v. Sassoon* (1995) 39 Cal.App.4th 1045, 1047; *Herrick v. Quality Hotels, Inns & Resorts, Inc.* (1993) 19 Cal.App.4th 1608, 1615–1616.) We will follow this practice.

**4** To obtain punitive damages, a plaintiff must prove oppression, fraud or malice by "clear and convincing evidence," not a mere preponderance of the evidence. (Civ. Code, § 3294, subd. (a); *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc*. (2000) 85 Cal.App.4th 1042, 1050.)

appeal from an order which is not appealable," (*Chapman v. Tarentola* (1960) 187 Cal.App.2d 22, 25), we dismiss the appeal.

## PRETRIAL PROCEEDINGS

### Complaint and Temporary Restraining Order

On May 16, 2012, plaintiff filed a complaint against Theresa and Alfonse, alleging they converted antiques owned by plaintiff. The complaint sought punitive damages.

On the same day the complaint was filed, plaintiff filed an ex parte application for a temporary restraining order (1) preventing defendants from "selling, concealing, encumbering, hypothecating, damaging or destroying" the antiques; (2) granting immediate access to all buildings at 2100 Old Highway in Catheys Valley, California, in order to "view, inspect, inventory, and photograph or videotape all antiques and collectibles that are presently at the property"; and (3) prohibiting defendants from spending or disbursing any funds derived from the sale of the antiques. The application was made without notice to defendants. (See Cal. Rules of Court, rule 3.1204(b)(3).)

On May 17, 2012, the court granted the temporary restraining order. The next day, the court ordered that the Mariposa County Sheriff's Department was "authorized to cut locks, chains or otherwise force entry to the real property and all buildings at 2100 Old Highway, Catheys Valley, CA, for which Defendants do not, immediately, allow entry."[5]

### Preliminary Injunction

On June 15, 2012, the court issued a preliminary injunction prohibiting all parties from selling, encumbering or hypothecating any of the antiques. The court also ordered

---

[5] The latter order was signed by Judge Wayne R. Parrish. Shortly thereafter, defendants filed a peremptory challenge to Judge Parrish pursuant to Code of Civil Procedure section 170.6.

all antiques "be placed in storage" at a specified location "with no access to be allowed to the storage unit without written Court order upon noticed motion."

**Defense Motion for Access to Antiques to Perform Expert Appraisal**

On September 25, 2012, defendants moved for access to the antiques to perform an expert appraisal. The court denied the motion without prejudice as "premature." At the hearing, the court indicated that it "would likely reconsider the motion" once all parties have been deposed.

**Plaintiff's Ex Parte Application to Access Antiques to Inspect for Water Damage**

On February 5, 2013, plaintiff filed an ex parte request for access to the antiques to inspect for water damage. The application indicated that it was made "without notice to the other side as the Castaldis currently represent themselves in *pro per* and time is of the essence to the protect the antiques." The court granted the request and authorized plaintiff to open the storage unit "only in the presence of an independent person from" the storage facility.

**Motion in Limine to Exclude Testimony of Theresa Castaldi**

On March 25, 2013, the first day of trial, plaintiff moved to exclude "any trial testimony of Theresa Castaldi" on the basis that her deposition had not been concluded. Defense counsel responded that he had received the motion "30 seconds ago." Defense counsel went on to say: "I don't care what the Court decides, but I haven't even decided whether I was going to call her anyway."

The court noted that it had indicated at a previous hearing that if Theresa failed to complete a deposition "the Court would consider not allowing her to testify." The court ultimately decided to "reserve" its decision on the issue, but did indicate that it was "leaning towards granting the motion."

Theresa was not called as a witness at trial.

## FIRST PHASE TRIAL EVIDENCE

The first phase of trial, regarding the issues of liability, compensatory damages, and entitlement to punitive damages, began on March 25, 2013.

### Plaintiff's Testimony

Plaintiff testified that he and Theresa Castaldi lived together at 2412 Old Highway in Catheys Valley, California, for over a decade. Plaintiff stored antiques in a temperature controlled room inside a barn on the property. By the time of trial, it was undisputed that Alfonse[6] had no ownership interest in these antiques.

In April 2012, after his relationship with Theresa ended, plaintiff discovered that all of the items he had stored in the room had been stolen.

### Recorded Telephone Conversation between Alfonse and a District Attorney Investigator

On May 18, 2012, Alfonse called an investigator with the Mariposa County District Attorney's Office named Michael Akers. Akers recorded the conversation.[7]

On the call, Alfonse said:

"He[8]took all the cattle stuff that we couldn't move that was on the property. And we said ok fine, we had no place for it, we had not use for it anyway, but we want the stuff that's in the barn. He said well if you want it you better come and get it before – I don't know what the date was, but we had like 3 days to go get it. So

---

[6] We refer to Alfonse and Theresa Castaldi by their first names to distinguish them from one another. No disrespect is intended.

[7] Akers testified that he did not know what Alfonse was going to say when he called and that "the recording started immediately when [he] picked up the phone." Akers testified the recording was made as part of an investigation of potential theft of personal property, but that he was not investigating the theft of Ken's antiques. Apparently, Akers was investigating a separate incident of potential theft of personal property. Alfonse testified that, at the time of the phone conversation, Akers was "helping" him "work with the law enforcement of Mariposa County on some other stuff."

[8] "He" presumably refers to plaintiff.

we hired, hired one of our Mexican workers and we took the truck and we loaded that stuff out of there, everything that was of value as much as we could get within that timeframe.  He said we could do it."

**Alfonse's Testimony**

Alfonse testified at trial, though the trial court ultimately found "the testimony … presented by Alfonse Castaldi to not be credible and in many respects untruthful."

Alfonse testified that Theresa wanted the items in the barn "removed."  Alfonse suggested someone she could hire to "help her out."  An unidentified "Mexican worker[]"[9] did ultimately help Theresa.  Alfonse accompanied the person to 2412 Old Highway, but did not pay him.  Alfonse also testified that he did not "physically load[]" the items.  He testified that he was preparing for back surgery and "was not lifting anything" at the time.

Alfonse did observe a "truckload"[10] of items being removed from the storage room, including chairs.  Someone later told Alfonse that more than one "truckload" was ultimately removed from 2412 Old Highway.

Alfonse allowed Theresa to store the antiques at another property.

**Trial Court's Oral Announcement of Decision**

On March 27, 2013, the court verbally announced that it found in favor of plaintiff and would be awarding six figures in damages.[11]

---

[9] This is the phrase used by Alfonse during his testimony.  It is quoted here because it is the same phrase Alfonse used in the recorded call with Akers.

[10] Counsel asked Alfonse how may "truckloads" he saw removed from 2412 Old Highway and Alfonse responded, "One."

[11] The court permitted Ken to testify as an expert on the value of some of the antiques.  The court largely credited Ken's testimony.

**PROCEEDINGS AFTER THE FIRST PHASE OF TRIAL**

**April 16, 2013, Ex Parte Application and Orders Thereon**

On April 16, 2013, plaintiff filed an ex parte application for a temporary restraining order and "preliminary" injunction preventing Theresa and Alfonse from transferring any assets without a court order. The ex parte application requested that the temporary restraining order "apply to any interest held in any capacity by Alfonse E. Castaldi in any aircraft, including, but not limited to, Piper Seneca, PA-34-200T, N number 2924C, Serial Number 34-7970379." The ex parte application also sought an order voiding all transfers of property to Alfonse Castaldi as trustee of the Ann Jay Revocable Trust.

In a supporting declaration, Ken's counsel indicated that on February 14, 2013, Alfonse had transferred title to two pieces of real property he had held in his individual capacity to himself as trustee of the Ann Jay Revocable Trust.

Alfonse opposed the ex parte application and argued that Ken was required to post an undertaking on the granting of an injunction. (Code Civ. Proc., § 529.)

On April 17, 2013, the court issued several orders.

First, it issued a temporary restraining order enjoining Theresa and Alfonse from transferring any asset before a preliminary injunction hearing set for May 13, 2013.

Second, the court ordered that any membership interest of Alfonse or Theresa in any limited liability company is "hereby charged and may be used to partially satisfy … any judgment by Plaintiff against Alfonse E. Castaldi … and/or Theresa Castaldi." The charging order claimed that it "constitutes a lien on the assignable membership interest(s)" of Alfonse and Theresa.

Third, the court issued an order "pursuant to Probate Code § 17000 et seq." voiding any transfer of property from Alfonse to himself as trustee of any trust since May

7.

16, 2012. The order also provided that Alfonse's interest in "any such Trust can be levied/executed on to satisfy the judgment in favor of plaintiff in this case."[12]

Fourth, the court ordered Theresa and Alfonse to show cause at a preliminary injunction hearing as to why they should not be restrained and enjoined from transferring assets without a court order.

**"Preliminary" Injunction**

On May 14, 2013, the court granted Ken a preliminary injunction against Alfonse and Theresa. The injunction prohibited Alfonse and Theresa from transferring assets and specifically mentioned the Piper Seneca aircraft.

**May 20, 2013, Judgment and Notices of Appeal Therefrom**

A document captioned "Judgment" was filed on May 20, 2013. The judgment set forth $610,500 in compensatory damages plus interest and costs against Alfonse and Theresa, jointly and severally. The judgment also indicated that the court "finds by a preponderance of the evidence that both defendants Alfonse Castaldi and Theresa Castaldi have acted with malice and with oppression toward plaintiff Ken Baker warranting an award of punitive damages to be assessed at a separate trial and set forth in an Amended Judgment."

On July 2, 2013 and August 23, 2013, Alfonse filed notices of appeal from the May 20, 2013, judgment in superior court. Another notice of appeal, filed September 13, 2013, indicated that Executive Air Charter, LLC and Annette Baker, trustee of the Ann Jay Trust also appealed from the May 20, 2013 judgment. Neither notice of appeal identified any judgment or order other than the May 20, 2013, judgment.

A final notice of appeal, which also identified orders entered on July 25, 2013 and August 13, 2013, was rejected for filing in superior court. This notice of appeal was dated

---

**12** Some of the appellants challenged this order by writ petition to this court. (Case No. F067165.) We denied the petition on May 9, 2013.

January 14, 2014, more than 150 days after the date of the latest order identified therein (i.e., August 13, 2013).

**Statement of Decision**

The court's statement of decision (§ 632) was also filed May 20, 2013. The statement of decision reflected that the court had found that Alfonse "personally assisted in the removal and conversion of some of Mr. Baker's items from the locked room at 2412 Old Highway." The court also found "the testimony and evidence presented by Alfonse Castaldi to not be credible and in many respects untruthful." The court further found that Alfonse's testimony contradicted his statements in the tape-recorded conversation with Akers.[13]

**Plaintiff's Uniform Fraudulent Transfer Act Lawsuit**

On May 22, 2013, plaintiff filed a separate lawsuit against Alfonse, individually and in his alleged capacity as trustee of the Ann Jay Revocable Trust UAD February 14, 2013 (the "Trust"); the Trust itself; Executive Air Charter, LLC; and Edward J. Castaldi. The suit alleged that Alfonse transferred assets to the Trust and to his son, Edward J. Castaldi, in violation of the Uniform Fraudulent Transfer Act (UFTA). (See Civ. Code, §§ 3439 et seq.)

**Plaintiff's Ex Parte Application to Add Judgment Debtors**

On July 1, 2013, plaintiff filed an ex parte application seeking to add Executive Air Charter, LLC ("Executive Air") and Alfonse Castaldi as trustee of the Ann Jay

---

[13] The statement of decision also details events after the complaint was filed, including Alfonse and Theresa's conduct in response to plaintiff's counsel's attempts to enforce a temporary restraining order issued shortly after the complaint was filed. It does not seem these events were properly at issue in this case. "Matters which occur after the date of the complaint … must be brought into the pending action, if at all, by means of a supplemental complaint. [Citation.]" (*Earp v. Nobmann* (1981) 122 Cal.App.3d 270, 286–287 disapproved on other grounds by *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219.)

Revocable Trust UAD February 14, 2013, as judgment debtors. The application and supportive filings were served on attorney Sean McLeod.[14]

On July 22, 2013, Executive Air, Edward Jay Castaldi and Annette Baker, trustees of the Ann Jay Trust filed an opposition to plaintiff's ex parte application.[15] In the opposition, the parties asserted that plaintiff failed to properly notice the ex parte hearing and that there was no adequate showing to support their addition as judgment debtors. All three parties were represented by attorney Cyril L. Lawrence.

After a hearing on July 25, 2013, the court granted plaintiff's request and ordered Executive Air; and Edward J. Castaldi and Annette Baker, as trustees "of The Ann Jay Revocable (or Irrevocable) Trust" added as defendants and judgment debtors, pursuant to Code of Civil Procedure section 187, *nunc pro tunc* to the date of judgment. The order was filed August 5, 2013.[16]

**Plaintiff's July 22, 2013, Ex Parte Application**

On July 22, 2013, plaintiff filed an ex parte request for orders regarding his attempts to execute on the Piper Aircraft. The court granted the requests, in part, on July 23, 2013.

**Punitive Damages Phase**

The punitive damages phase began on August 6, 2013. The reporter's transcript of the punitive damages phase is not part of the appellate record.

---

[14] There is no indication in the record that Mr. McLeod had appeared as counsel of record for Executive Air prior to Baker's July 1, 2013, filings. Indeed, there is no indication that either Executive Air or Alfonse in his capacity as a trustee had appeared in the case at all.

[15] The opposition was titled "Special Appearances by Executive Air Charter, LLC and Edward J. Castaldi and Annette Baker Co-Trustees of the Ann Jay Trust Opposition to Inclusion as Third Party Debtors [CCP § 187]."

[16] Some of the appellants challenged this order by writ petition to this court. (Case No. F067731.) We summarily denied the petition on August 15, 2013.

10.

In an "Amended Judgment" dated August 13, 2013, the court awarded punitive damages against Alfonse in the amount of $600,000. Alfonse filed a motion for new trial on the issue of punitive damages.[17]

**Plaintiff's Ex Parte Application filed November 13, 2013**

On November 13, 2013, plaintiff filed an ex parte application requesting that the court order Alfonse; Annette Baker, Trustee of the Ann Jay Trust; and Edward J. Castaldi as trustee of the Ann Jay Trust to deposit funds with the court. The application was purportedly made "without notice to opposing counsel or their clients" because "defendants have evidenced, and continue to evidence, that they will violate the Orders of this Court and will attempt to conceal assets."

The court granted the application and ordered the following parties to deposit the following amounts with the court clerk: Alfonse was to deposit $166,660.65; Edward J. Castaldi as trustee of The Ann Jay Trust was to deposit $48,500; and Annette Baker, trustee of The Ann Jay Trust was to deposit $30,000. The court ordered defendants to appear in court on December 4, 2013, to show cause why they should not be adjudged in contempt of court for disobeying the May 2013 preliminary injunction. The court's order directed that "Plaintiff shall make reasonable effort to serve this Order and all supporting documentation on each of the defendants." The order further provided that if "a process server is unable to make personal service on any of these defendants, the posting at the above locations of all required documents, with this Order clearly visible, at least five calendar days before the hearing, shall be sufficient notice."

Without citation to the record, appellants' brief claims: "At a subsequent hearing on contempt, both Castaldi and the trustee were found guilty of direct and indirect

---

[17] Alfonse's brief indicates, without citation to the record, that the motion was denied.

11.

contempt, and are now in custody without ever receiving personal service of the order to show cause."

## DISCUSSION

I. <u>The Appeal Must be Dismissed</u>

    a. The Appealability of a Judgment is Jurisdictional

As a preliminary matter we must determine whether the May 20, 2013, "judgment" is indeed a final, appealable judgment. Neither party raised this issue in their initial briefs. However, "[t]he appealability of the judgment or order is jurisdictional and an attempt to appeal from a nonappealable judgment or order will ordinarily be dismissed. [Citations.]" (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 297.) "It is the duty of an Appellate Court on its own motion to dismiss an appeal from an order which is not appealable. [Citation.]" (*Chapman v. Tarentola*, *supra*, 187 Cal.App.2d at p. 25.) We afforded the parties the opportunity to file supplemental briefs regarding the appealability of the May 20, 2013, "judgment."[18]

" 'In civil matters, our appellate jurisdiction is limited to the judgments and orders described in Code of Civil Procedure section 904.1. Only *final* judgments are appealable under that statute .…'[Citations.]" (*Papadakis v. Zelis* (1992) 8 Cal.App.4th 1146, 1149, italics in original.)

    b. The May 20, 2013, "Judgment" was Interlocutory and Not Appealable

A judgment "is the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) Generally, a judgment is final " 'where no issue is left for future consideration except the fact of compliance or noncompliance with' " the order. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698 (*Griset*).) " '[B]ut where anything further in the nature of judicial action on the part of the court is

---

[18] In his supplemental brief, plaintiff now contends the May 20, 2013, "judgment" was interlocutory and not appealable.

essential to a final determination of the rights of the parties, the decree is interlocutory.' [Citations.]" (*Id*. at pp. 698–699.)

The present appeal is from a single purported "judgment": The May 20, 2013, "judgment." That document states that judgment is made against defendants, jointly and severally, and sets forth $610,500 in compensatory damages plus interest and costs. However, the document also states that the court finds plaintiff is entitled to punitive damages in an amount "to be assessed at a separate trial."

Under the general test in *Griset*, it seems quite clear that the May 20, 2013, "judgment" was interlocutory. While a final judgment leaves no issue left for future consideration except compliance (*Griset*, *supra*, 25 Cal.4th at p. 698), the May 20, 2013, "judgment" did leave open an issue for future consideration: The amount of punitive damages. Determining the amount of punitive damages at a court trial seems quite clearly to be a type of " 'judicial action on the part of the court' " that is " 'essential to a final determination of the rights of the parties ….' " (*Ibid*.) As a result, the May 20, 2013, "judgment" was interlocutory.[19]

c. Appellants' Contentions are Unavailing

Appellants argue that if the May 20, 2013, "judgment" was not final, "then respondent should not have been able to enforce that judgment until a final order issued." That may well be. But even if we accept appellants' contention that the subsequent enforcement orders were erroneous, that would not confer appealability on the May 20,

---

[19] The fact that appellants attempted to file a third notice of appeal identifying the August 2013 "Amended Judgment" suggests they may have been aware of the deficiencies in the two prior notices of appeal.

13.

2013, "judgment." The merits of an appeal cannot confer jurisdiction where it is lacking.[20] (*In re Frederick E.H.* (1985) 169 Cal.App.3d 344, 348.)

---

[20] We do note that we are troubled by the order setting aside all transfers of property from Alfonse to "any Trust" after May 16, 2012, and the order adding judgment debtors.

The order pertaining to trust transfers was purportedly made "pursuant to Probate Code § 17000 et seq." Yet, respondent identifies no specific authorizing language within the broad swath of statutory law that is "Probate Code § 17000 et seq." Even assuming the Probate Code's provisions relating to "proceedings concerning trusts" (Div. 9, Part 5, Ch.3 of the Probate Code) did provide otherwise relevant statutory authority, that authority would presumably only exist in a proceeding commenced by the filing a probate petition. (Prob. Code, § 17201.)

Respondent contends that the probate order was appropriate "because there was no consideration paid for the transfer of Mr. Castaldi's 50% interest in the San Bernardino County property to his son J.E. Castaldi, which was done after the court announced its compensatory damages decision." (Some capitalization removed.) Respondent concludes the transfer was "patently fraudulent and subject to being set aside." These contentions miss the point. Respondent may be entirely correct that Alfonse's transfer of real property was voidable as a fraudulent transfer. (See Civ. Code, § 3439.04, subd. (a).) And, if he can prove as much at a trial, the UFTA provides for several remedies including avoidance of the transfer. (See Civ. Code, § 3439.07, subd. (a)(1).) But that remedy is statutorily authorized "[i]n an *action* for relief against a transfer or obligation under" the UFTA. (Civ. Code, § 3439.07, subd. (a), italics added.) A claim under the UFTA is a "cause of action" (Civ. Code, § 3439.09) not a law and motion matter that can be appended to a preexisting action on a different cause of action that has already been tried. (Cf. *Killian v. Millard* (1991) 228 Cal.App.3d 1601, 1606–1607 [court may not issue law and motion order voiding contract between a party and a stranger to the action on public policy grounds, as such an issue must go to trial]; *Donald J. v. Evna M.* (1978) 81 Cal.App.3d 929, 933–934 ["A motion is distinguishable from the more formal application for relief by petition or complaint.… It is not consonant with regular procedure to raise in a motion wholly distinct and independent matters which generally should be the subject of a formal petition or complaint"].) Presumably that is why respondent filed a separate UFTA lawsuit against Alfonse shortly after the court's May 20, 2013, "judgment." Neither the UFTA nor the Probate Code authorized respondent to forego the inconvenience of a trial on his UFTA complaint by simply filing a posttrial motion in the conversion action.

The order adding some of the appellants as judgment debtors is likewise troubling. "The alter ego doctrine traditionally is applied to pierce the corporate veil so that a

14.

Appellants argue the May 20, 2013, "judgment" "implicitly" refers to itself as the final judgment. But "[a] paper filed in an action does not become a judgment merely because it is so entitled; it is a judgment only if it satisfies the criteria of a judgment…." (*City of Shasta Lake v. County of Shasta* (1999) 75 Cal.App.4th 1, 10; cf. *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1107 ["allowing the parties and trial court to designate a substantively interlocutory judgment as final and appealable – would be inconsistent with the one final judgment rule"].) [21]

shareholder may be held liable for the debts or conduct of the corporation." (*Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1518.) In this case, the trial court did something different: It pierced the "corporate veil" in reverse to hold Executive Air Charter, LLC, liable for the debts or conduct of its member, Alfonse. This is called " 'third party' reverse piercing" (*id.* at p. 1518) and has been rejected in California. (See generally *id.* at p. 1510.)

"[T]he issue addressed by outside reverse piercing is the shareholder's transfer of personal assets to the corporation to shield the assets from collection by a creditor of the shareholder. In other words, outside reverse piercing seeks to protect the judgment creditor from the shareholder's fraudulent transfer of assets to the corporation. But … conversion and fraudulent conveyance already afford judgment creditors protection in that situation. Outside reverse piercing, accomplished by the expedient means of a postjudgment motion, is an unacceptable shortcut to pursue those remedies." (*Postal Instant Press, Inc. v. Kaswa Corp.*, *supra*, 162 Cal. App.4th at p. 1523.)

[21] "[I]t is the substance and effect of an adjudication that is determinative, not the form of the decree. [Citation.]" (*Otay River Constructors v. San Diego Expressway* (2008) 158 Cal.App.4th 796, 801.) Even if it were determined that appellants were reasonably lured into thinking the May 20, 2013, "judgment" was appealable due to an error on the part of the trial court, it would not alter our conclusion. The "appealability of the judgment or order is jurisdictional" (*Marsh v. Mountain Zephyr, Inc.*, *supra,* 43 Cal.App.4th at p. 297), and jurisdictional defects in the notice of appeal cannot be excused on equitable grounds. (See *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 116.)

By analogy, consider the deadlines for filing a notice of appeal. (Cal Rules of Court, rules 8.104, 8.108(b).) Those deadlines are jurisdictional and will bar an appeal even where the trial court has arguably led a litigant astray.

"*Weznoski v. Central Banking System, Inc*. (1987) 43 Cal.3d 539 [] … demonstrates the rule's rigidity. There the trial court allowed a second motion for new

Appellants also cite the "death knell" doctrine but fail to explain why it would apply here. "The death knell doctrine permits the appellate court to review an order denying a motion to certify a class when it is unlikely the case will proceed as an individual action. [Citation.]" (*Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1098.) The doctrine is " 'a tightly defined and narrow concept' " (*In re Baycol Cases I and II* (2011) 51 Cal.4th 751, 760), and we strongly doubt it has any application outside the class action context. Regardless, it is undisputed that the doctrine does not apply unless there is an order that "amounts to a de facto final judgment for absent plaintiffs …." (*Id.* at p. 759.) The May 20, 2013, "judgment" is not such an order.

Finally, appellants ask that we find any objections to the appealability of the May 20, 2013, "judgment" were "waived." Jurisdiction cannot be conferred upon an appellate court by waiver. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1216.)

> d. Liberal Construction of Appellants' Notices of Appeal does not Save the Invalid Appeal

In arguing that we may review the judgment debtor and probate orders, appellants cite the rule that a "notice of appeal shall be liberally construed in favor of its sufficiency [citation] …." (*Vibert v. Berger* (1966) 64 Cal.2d 65, 67.)

Appellants argue the rule of liberal construction applies in this case, because their notices of appeal were, at worst, "premature." They submit any flaw in the notices of appeal may be disregarded under *Groves v. Peterson* (2002) 100 Cal.App.4th 659, 666, fn. 2 (*Groves*) and *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1263,

---

trial after denying the first. The Supreme Court held the trial court lost jurisdiction to do anything in the case after ruling on the first motion, making proceedings on the second a nullity. The time for appeal ran from the denial of the first motion, and the appellant was not entitled to relief from a tardy filing even if the trial court erroneously led the parties to believe it could rule on the second motion. [Citation.]" (*Freiberg v. City of Mission Viejo* (1995) 33 Cal.App.4th 1484, 1489.)

fn. 3 (*Bardin*).  In *Groves* and *Bardin*, the appellants were attempting to challenge the trial court's sustaining of a demurrer.  However, the notices of appeal incorrectly identified the order sustaining demurrer rather than correctly identifying the judgment dismissing the complaint pursuant to the sustained demurrer.  In each case, the Court of Appeal excused the flaw.  (*Bardin*, *supra*, 136 Cal.App.4th at p. 1263, fn. 3; *Groves*, *supra*, 100 Cal.App.4th at p. 666, fn 2.)

We need not decide whether we agree with *Bardin* and *Groves*, because they are distinguishable.  The notice[s] filed in the present case do not present " 'a mere misdescription' of the judgment" (*Glassco v. El Sereno Country Club, Inc.* (1932) 217 Cal. 90, 92), but instead clearly and correctly identify a single order or judgment:  The May 20, 2013, "judgment."  Appellants would have us construe the notices of appeal, which identify one order, as a premature appeal from an entirely different order entered months later, which awarded $600,000 in punitive damages for the first time.  But it is well "beyond liberal construction" to view an appeal from one order as an appeal from a "further and different order."  (*Russell v. Foglio* (2008) 160 Cal.App.4th 653, 661.) "Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed."  (*Shiver, McGrane & Martin v. Littell* (1990) 217 Cal.App.3d 1041, 1045.)  "The rule favoring appealability in cases of ambiguity cannot apply where there is a clear intention to appeal from only … one of two separate appealable judgments or orders.  [Citation.]"  (*Norman I.  Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47.)

e.  Our Conclusion is Consistent with Analogous Precedent

Our conclusion that the May 20, 2013, "judgment' is not appealable is consistent with our decision in *Plaza Tulare v. Tradewell Stores, Inc.* (1989) 207 Cal.App.3d 522 (*Plaza Tulare*).  That case involved a dispute over the interpretation of a written lease. (*Id.* at p. 523.)  The trial was bifurcated (Code Civ. Proc., § 598) with the issue of lease

interpretation to be tried separately from damages. (*Plaza Tulare*, *supra*, at p. 523.) Respondents prevailed at the first trial regarding lease interpretation. (*Ibid*.) Appellants purported to appeal from the order adjudicating the issues presented at the first trial. (*Ibid*.)

We noted that "[a] positive verdict of liability in [a bifurcated] trial merely has the same status as a partial verdict or finding. [Citation.]" (*Plaza Tulare*, *supra*, 207 Cal.App.3d at p. 524.) Consequently, we held that the adjudication of the issues in the first trial was an "interlocutory judgment" and could not be appealed. (*Ibid*.) As a result, we dismissed the appeal. (*Id*. at p. 525.)[22]

Appellants seek to distinguish *Plaza Tulare*, arguing that the present case did not involve a "stipulated bifurcation." We see no legal significance to this distinction. Appealability of an adjudication turns on its "substance and effect." (*Otay River Constructors v. San Diego Expressway*, *supra*, 158 Cal.App.4th at p. 801.) The procedural history leading up to the adjudication is relevant insofar as it informs this inquiry. But whether the "bifurcation" in this case was stipulated or not is irrelevant because it does not change the fact that the May 20, 2013, judgment left unresolved an issue essential to the final determination of the rights of the parties.

The appeal must be dismissed. (Cf. *Plaza Tulare*, *supra*, 207 Cal.App.3d at pp. 524–525.)

---

[22] In this case, liability, compensatory damages, and entitlement to punitive damages were tried in the first phase of trial and the amount of punitive damages was tried in the second phase, whereas in *Plaza Tulare*, liability was tried first and all damages were scheduled to be tried second. (*Plaza Tulare*, *supra*, 207 Cal.App.3d at p. 523.) This difference is inconsequential because whether the damages are compensatory or punitive, their calculation is an issue essential "the final determination of the rights of the parties" (§ 577). Consequently, any order that leaves the completion of trial on compensatory or punitive damages for the future is not a final judgment.

## CONCLUSION

We understand the result in this case may seem harsh, as appellants are prevented from obtaining review of several unusual orders now and possibly ever.[23]  However, "[t]his court is without power to bestow jurisdiction on itself .…" (*Mid-Wilshire Associates v. O'Leary* (1992) 7 Cal.App.4th 1450, 1455.)  "Appellate jurisdiction is solely within the province of our Legislature" (*ibid.*), and we are not at liberty to modify the standards for appealability.  (*In re Baycol Cases I and II*, *supra*, 51 Cal.4th at p. 759, fn. 5; see also *Kurwa v. Kislinger*, *supra*, 57 Cal.4th at p. 1107.)

## DISPOSITION

Appellants' request for sanctions under California Rules of Court, rule 8.882(c)(1)(B) is denied.  The appeal is dismissed.  The parties shall bear their own costs.

_____
Poochigian, J.

WE CONCUR:


_____
Gomes, Acting P.J.



_____
Franson, J.

---

[23] Though we may not review the orders in this appeal, appellants are not necessarily without remedy.  If appellants are correct that the various orders are void on their face, the orders " 'may be set aside on motion, at any time … by the court which … made the order[s].'  [Citations.]" (*Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 19.)  And, in some circumstances, a trial court's order denying such a motion is appealable.  (See *Carlson v. Eassa* (1997) 54 Cal.App.4th 684, 691.)

19.

Filed 3/16/15

| | |
|---|---|
| KEN R. BAKER, | F067687 |
| Plaintiff and Respondent, | (Mariposa Sup. Ct. No. 10161) |
| v. | **ORDER** |
| ALFONSE CASTALDI et al., | |
| Defendants and Appellants. | |

BY THE COURT:

It appearing that part of the nonpublished opinion filed in the above entitled matter on February 18, 2015, meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the following exceptions:

(1) Omit the sections entitled "PRETRIAL PROCEEDINGS," "FIRST PHASE TRIAL EVIDENCE," and "PROCEEDINGS AFTER THE FIRST PHASE OF TRIAL" and all subsections and footnotes contained therein. This omission spans from the third line of page three to the second line of page 12 of the nonpublished opinion; and

(2) Omit footnote 20.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
FRANSON, J.